```
                IN THE UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF ARKANSAS
                         FORT SMITH DIVISION
```

DANNY FITZGERALD                                                PLAINTIFF

         v.                    No. 06-2054

ACTION INC.                                                     DEFENDANT


## MEMORANDUM OPINION

Plaintiff filed a Complaint against Action, Inc. on May 8, 2006. (Doc. 1). Plaintiff alleged that he was discriminated against on the basis of his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, and the Arkansas Civil Rights Act ("ACRA"), Ark. Code Ann. § 16-123-107(c). He further alleged that Defendant terminated him in order to interfere with prospective insurance benefits in violation of § 510 of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*.

In an April 19, 2007 order, this Court granted Defendant's Motion for Summary Judgement on Plaintiff's ADEA and ERISA claims and declined to retain jurisdiction over his ACRA claim. Plaintiff appealed this order to the Eighth Circuit Court of Appeals. The Eighth Circuit affirmed this Court's award of summary judgement on Plaintiff's ADEA claim and reversed its ruling on Plaintiff's ERISA claim. Specifically, the Court of Appeals held that a genuine issue of material fact existed as to whether Action's stated reasons for Plaintiff's termination were merely pretext for its interference with his insurance benefits. *See*, *Fitzgerald v.*

*Action Inc.*, 521 F.3d 867 (8th Cir. 2008). On August 8, 2008, this Court held a bench trial to determine the pretext issue. For the reasons stated below, the Court finds that Defendant's termination decision was not pretextual. The Court renders judgment for Defendant and Plaintiff's Complaint is DISMISSED WITH PREJUDICE.

**Findings of Fact**

1. On November 12, 2003, Danny Fitzgerald began working as a shop hand for Action in Barling, Arkansas.
2. Fitzgerald was fifty years old.
3. After meeting the requisite six-month period of employment, Fitzgerald elected to participate in Action's group health insurance plan.
4. At all relevant times, Action had no control over whether its insurer covered the specific claims of specific employees. Rather, Action—as part of its benefits package—was responsible for the difference between the total plan premiums and the amount paid by its employees.
5. At all relevant times, Action was an at-will employer with no established procedure for the termination of its employees.
6. Action had no system of employee performance review.
7. On July 2, 2004, Fitzgerald signed an Employee Acknowledgment Form in which he acknowledged that his employment at Action was "at-will."
8. On February 25, 2005 and while at work, Fitzgerald was

involved in an incident with Action's Safety Director, Harold Yandell. The incident resulted in a fall that re-aggravated a shoulder injury Fitzgerald suffered in a March 2002 accident unrelated to his employment at Action.

9. On February 25, 2005 and March 1, 2005, Fitzgerald sought medical treatment at Sparks Preferred South in Fort Smith, largely to address complaints of back and shoulder pain. In order to avoid the filing of a workers' compensation claim, Action reimbursed Fitzgerald for his co-pay expenses related to the incident.

10. In response to continued shoulder pain, Fitzgerald had a consultation with orthopedic surgeon Dr. Greg Jones at the River Valley Musculoskeletal Center in Fort Smith on May 11, 2005. Dr. Jones advised Fitzgerald that he needed shoulder surgery, though no date for the surgery was set.

11. Fitzgerald informed management at Action—including his supervisor Raymond Easely and shop manager Pete Garner—that he would be having surgery. Fitzgerald told Garner that he planned to use accumulated vacation time for his recovery period.

12. On May 16, 2008, Dr. Jones conducted an MRI in order to identify the precise procedure to perform on Fitzgerald.

13. Fitzgerald was terminated by Easely on May 17, 2005.

14. Per Easely's complaints about Fitzgerald's work performance,

Garner had authorized Easley to fire Fitzgerald—to do whatever he needed to do with respect to Fitzgerald's employment status. This authorization predated Fitzgerald's May 16, 2005 MRI.

15. Easley terminated Fitzgerald because of an abuse of bathroom privileges and a pattern of misconduct which occurred between February 4, 2005 and May 17, 2005. The misconduct included disregard of safety protocol, standing around, talking back, being late for work, smoking at unauthorized times and places, and shaking a vending machine.

16. Easley encouraged Fitzgerald to file for unemployment benefits. In his Application for Unemployment Insurance Benefits, Fitzgerald stated that he was "laid off" due to a "lack of work." This explanation went unchallenged by Action.

17. The official date of Fitzgerald's shoulder surgery was set sometime after May 20, 2005.

18. In connection with his termination, Fitzgerald's health insurance coverage with Action continued in effect until May 31, 2005.

19. Action offered Fitzgerald the opportunity to continue his health insurance coverage beyond May 31, 2005 under COBRA. Fitzgerald had until June 30, 2005 to retain his coverage at a cost of $245.68 per month. Fitzgerald elected not to retain coverage.

20. Fitzgerald underwent surgery on June 28, 2005 at the Summit Medical Center in Van Buren, Arkansas.

21. David Gibson—an allegedly similarly situated employee to Fitzgerald—was hired by Action on August 23, 2004 as a shop hand.

22. Gibson was forty eight at the time.

23. Gibson had missed and arrived late for work more than Fitzgerald, was "written up" for smoking on the loading dock with Fitzgerald, was "written up" for insubordination, and had been sent home from work.

24. Gibson was not enrolled in Action's group health insurance plan.

25. David Gibson's employment with Action ended on October 17, 2005 due to a reduction in his hours.

## **Conclusions of Law**

Under § 510 of the Employment Retirement Income Security Act ("ERISA"), an employer may not terminate an employee-participant in an employee benefit plan "for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140. Section 510 claims based on circumstantial evidence are analyzed under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*. Accordingly, the plaintiff bears the initial burden of showing that (1) he suffered an adverse employment action, (2)he was likely to

receive future benefits, and (3) there was a causal connection between the adverse action and the likelihood of future benefits. *See*, *Kinkead v. Southwestern Bell Tel. Co.*, 49 F.3d 454, 457 (8th Cir. 1995). Thereafter, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its adverse employment action. If the defendant articulates such a reason, the burden shifts back to the plaintiff to show that the defendant's proffered reason was pretextual. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973).

To establish pretext under § 510, the plaintiff must show that the defendant "had a specific intent to interfere with [his insurance] benefits, but that may be shown by circumstantial evidence." *Register v. Honeywell Fed. Mfg. & Techs.*, LLC, 397 F.3d 1130, 1136-37 (8th Cir. 2005). Under the precedent of this Circuit, a plaintiff can demonstrate pretext in a variety of ways.

> An employee may prove pretext by demonstrating that the employer's proffered reason has no basis in fact, that the employee received a favorable review shortly before he was terminated, that similarly situated employees who did not engage in the protected activity were more leniently treated, that the employer changed its explanation for why it fired the employee, or that the employer deviated from its policies.

*Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1052 (8th Cir. 2006). In evaluating the plaintiff's circumstantial evidence of pretext, "temporal proximity may directly support an inference of retaliation, and it may also affect the reasonableness of inferences drawn from other evidence." *Wallace v. DTG Operations,*

*Inc.*, 442 F.3d 1112, 1122 (8th Cir. 2006). In short, a plaintiff must ultimately show that he would not have been terminated had he not been entitled to benefits. *See*, *Koons v. Aventis Pharmaceuticals, Inc.*, 367 F.3d 768 (8th Cir. 2004).

In the case before this Court, Plaintiff attempts to show pretext based on (1) Action's allegedly inconsistent or changing explanations for his termination;(2) Action's alleged failure to follow its regular termination policy; (3) Action's allegedly more lenient treatment of David Gibson—a similarly situated employee; and (4) in light of the previous, the temporal proximity between Plaintiff's notifying Action of his proposed surgery and his termination. As set forth below, Plaintiff has failed to prove that Action's stated reasons for terminating him were pretext for its interference with his health insurance benefits.

Varying explanations for an employment decision can call into question whether any of the stated reasons were the true reasons for the employment decision. *Tatum v. City of Berkeley*, 408 F.3d 543, 554 (8th Cir. 2005). Fitzgerald asserted that Action terminated him on May 17, 2005 to prevent him from making an insurance claim for his upcoming shoulder surgery. He claimed that Action—as evidenced by its policy of paying medical expenses out-of-pocket in order to avoid workers' compensation claims—made a contentious effort to keep all of its insurance premiums low and maximize its profits. While Action strives for low premiums, there

is no indication that it does so to the detriment of its employees. Indeed, by Fitzgerald's own testimony, Action told him that it would pay his medical expenses relating to his February 25, 2005 fall in order to prevent the filing of a workers' compensation claim. After he received treatment, Action reimbursed him for his co-pay, meaning that he filed an insurance claim. Thus, the effort to reduce insurance costs does not equate to a specific intent to deny an employee insurance benefits.

    According to Raymond Easley, he was given the authority to terminate Fitzgerald prior to May 16. Pete Garner told Easley to do whatever he needed to do with respect to Fitzgerald's employment status. Easley ultimately terminated Fitzgerald based on abuse of restroom privileges and a pattern of misconduct—evidenced in part by the filing of seven Employee Action Forms—that included disregard of safety protocol, standing around, talking back, being late for work, smoking at unauthorized times and places, and shaking a vending machine. Critically, Easley was simply not motivated by a desire to interfere with Fitzgerald's health insurance benefits. Easley had no dealings with insurance administration and his compensation was not related to the premiums paid by Action. Thus, despite the fact that the termination took place six days after Fitzgerald's initial consultation with Dr. Jones and just one day after Fitzgerald received an MRI on his shoulder, the timing of the termination does not support an

inference of pretext.  *Wallace*,  442 F.3d at 1122.

The fact that Action did not challenge Fitzgerald's unemployment application—which stated that he was "laid off" due to a "lack of work"—does not compel the conclusion that Action provided alternative explanations for its termination decision. More specifically, the fact that Action did not challenge Fitzgerald's unemployment application does not prove that Easley terminated Fitzgerald to interfere with insurance benefits and not because of job-related misconduct.  Accordingly, Fitzgerald failed to demonstrate pretext by showing that Action offered truly inconsistent or changing explanations of its employment decision.

A plaintiff can also show pretext by proving that an employer did not follow its own policy when terminating the plaintiff. *Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 727 (8th Cir.2001).  According to the testimony of Easley, his normal practice as supervisor was to first give a verbal warning to an employee who violated Action company policy, and then, if he wrote the employee up three times for the same violation in a ninety-day period, he would terminate the employee.  However, he also indicated that this policy was not compulsory.  Further, according to Action's Employee Handbook and the testimony of two former Action shop hands—David Gibson and Pat Shephard, employment at Action was "at-will."  Indeed, Fitzgerald signed an Employee Acknowledgment Form clearly indicating his status as an "at-will"

employee. Thus, Fitzgerald failed to prove that Action had an established termination policy, and consequently, he did not show that Action failed to follow its termination policy.

The Court notes that even in a strictly at-will employment context, an employer cannot terminate an employee in order to interfere with his or her insurance benefits. However, it is far from clear that Action's termination of Fitzgerald—based on the timing of the termination—necessarily would have achieved the intended benefits deprivation that Fitzgerald alleges. Under Action's policy, Fitzgerald automatically remained insured until May 31, 2005. Further, Action offered Fitzgerald the opportunity to continue his health insurance coverage under COBRA. Accordingly, the timing of Action's decision provides little support for Action's alleged pretext.

Finally, pretext can be shown by evidence proving that an employer treated a similarly situated employee differently than it treated the plaintiff. *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994). Fitzgerald pointed to David Gibson as one such employee. Gibson was hired by Action on August 23, 2004 as a shop hand. He was forty eight at the time. He had missed and arrived late for work more than Fitzgerald, was "written up" for smoking on the loading dock with Fitzgerald, was "written up" for subordination, and had been sent home from work. Gibson was not enrolled in Action's group health insurance plan. His employment

with Action ended on October 17, 2005 due to a reduction in his hours. Like Fitzgerald, Gibson's claim for unemployment benefits went unchallenged by Action. Gibson's employment experience at Action does not establish pretext. Despite the fact that he did not participate in Action's insurance plan, he was nonetheless terminated five months after Fitzgerald.

**Conclusion**

Based on the foregoing, this Court finds in favor of Defendant and Plaintiff's Complaint is DISMISSED WITH PREJUDICE. All parties are to bear their own costs and fees.

IT IS SO ORDERED this 22nd day of August, 2008.

                                         */s/ Robert T. Dawson*
                                         Robert T. Dawson
                                         United States District Judge